Justice Stevens, with whom Justice Souter, Justice Ginsburg, and Justice Breyer
join, dissenting.
The question presented by this case is not whether the Second Amendment protects a “collective right” or an “individual right.” Surely it protects a right that can be enforced by individuals. But a conclusion that the Second Amendment protects an individual right does not tell us anything about the scope of that right.
Guns are used to hunt, for self-defense, to commit crimes, for sporting activities, and to perform military duties. The Second Amendment plainly does not protect the right to use a gun to rob a bank; it is equally clear that it does encompass the right to use weapons for certain military purposes. Whether it also protects the right to possess and use guns for nonmilitary purposes like hunting and personal self- *637 defense is the question presented by this case. The text of the Amendment, its history, and our decision in United States v. Miller, 307 U. S. 174 (1939), provide a clear answer to that question.
The Second Amendment was adopted to protect the right of the people of each of the several States to maintain a well-regulated militia. It was a response to concerns raised during the ratification of the Constitution that the power of Congress to disarm the state militias and create a national standing army posed an intolerable threat to the sovereignty of the several States. Neither the text of the Amendment nor the arguments advanced by its proponents evidenced the slightest interest in limiting any legislature’s authority to regulate private civilian uses of firearms. Specifically, there is no indication that the Framers of the Amendment intended to enshrine the common-law right of self-defense in the Constitution.
In 1934, Congress enacted the National Firearms Act, the first major federal firearms law.[1] Sustaining an indictment under the Act, this Court held that, “[i]n the absence of any evidence tending to show that possession or use of a ‘shotgun having a barrel of less than eighteen inches in length’ at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.” Miller, 307 U. S., at 178. The view of the Amendment we took in Miller—that it protects the right to keep and bear arms for certain military purposes, but that it does not curtail the Legislature’s power to regulate the nonmilitary use and ownership of weapons — is both *638 the most natural reading of the Amendment’s text and the interpretation most faithful to the history of its adoption.
Since our decision in Miller, hundreds of judges have relied on the view of the Amendment we endorsed there;[2] we ourselves affirmed it in 1980. See Lewis v. United States, 445 U. S. 55, 65-66, n. 8 (1980).[3] No new evidence has surfaced since 1980 supporting the view that the Amendment was intended to curtail the power of Congress to regulate *639 civilian use or misuse of weapons. Indeed, a review of the drafting history of the Amendment demonstrates that its Framers rejected proposals that would have broadened its coverage to include such uses.
The opinion the Court announces today fails to identify any new evidence supporting the view that the Amendment was intended to limit the power of Congress to regulate civilian uses of weapons. Unable to point to any such evidence, the Court stakes its holding on a strained and unpersuasive reading of the Amendment’s text; significantly different provisions in the 1689 English Bill of Rights, and in various 19th-century State Constitutions; postenactment commentary that was available to the Court when it decided Miller; and, ultimately, a feeble attempt to distinguish Miller that places more emphasis on the Court’s decisional process than on the reasoning in the opinion itself.
Even if the textual and historical arguments on both sides of the issue were evenly balanced, respect for the well-settled views of all of our predecessors on this Court, and for the rule of law itself, see Mitchell v. W. T. Grant Co., 416 U. S. 600, 636 (1974) (Stewart, J., dissenting), would prevent most jurists from endorsing such a dramatic upheaval in the law.[4] As Justice Cardozo observed years ago, the “labor of *640 judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one’s own course of bricks on the secure foundation of the courses laid by others who had gone before him.” The Nature of the Judicial Process 149 (1921).
In this dissent I shall first explain why our decision in Miller was faithful to the text of the Second Amendment and the purposes revealed in its drafting history. I shall then comment on the postratification history of the Amendment, which makes abundantly clear that the Amendment should not be interpreted as limiting the authority of Congress to regulate the use or possession of firearms for purely civilian purposes.
I
The text of the Second Amendment is brief. It provides: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.”
Three portions of that text merit special focus: the introductory language defining the Amendment’s purpose, the class of persons encompassed within its reach, and the unitary nature of the right that it protects.

“A well regulated Militia, being necessary to the security of a free State”

The preamble to the Second Amendment makes three important points. It identifies the preservation of the militia as the Amendment’s purpose; it explains that the militia is necessary to the security of a free State; and it recognizes that the militia must be “well regulated.” In all three respects it is comparable to provisions in several State Decla *641 rations of Rights that were adopted roughly contemporaneously with the Declaration of Independence.[5] Those state provisions highlight the importance members of the founding generation attached to the maintenance of state militias; they also underscore the profound fear shared by many in that era of the dangers posed by standing armies.[6] While *642 the need for state militias has not been a matter of significant public interest for almost two centuries, that fact should not obscure the contemporary concerns that animated the Framers.
The parallels between the Second Amendment and these state declarations, and the Second Amendment’s omission of any statement of purpose related to the right to use firearms for hunting or personal self-defense, is especially striking in light of the fact that the Declarations of Rights of Pennsylvania and Vermont did expressly protect such civilian uses at the time. Article XIII of Pennsylvania’s 1776 Declaration of Rights announced that “the people have a right to bear arms for the defence of themselves and the state,” 1 Schwartz 266 (emphasis added); § 43 of the Declaration ensured that “[t]he inhabitants of this state shall have the liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands therein not inclosed,” id., at 274. And Article XV of the 1777 Vermont Declaration of Rights guaranteed “[t]hat the people have a right to bear arms for the defence of themselves and the State.” Id., at 324 (emphasis added). *643 The contrast between those two declarations and the Second Amendment reinforces the clear statement of purpose announced in the Amendment’s preamble. It confirms that the Framers’ single-minded focus in crafting the constitutional guarantee “to keep and bear Arms” was on military uses of firearms, which they viewed in the context of service in state militias.
The preamble thus both sets forth the object of the Amendment and informs the meaning of the remainder of its text. Such text should not be treated as mere surplusage, for “[i]t cannot be presumed that any clause in the constitution is intended to be without effect.” Marbury v. Madison, 1 Cranch 137, 174 (1803).
The Court today tries to denigrate the importance of this clause of the Amendment by beginning its analysis with the Amendment’s operative provision and returning to the preamble merely “to ensure that our reading of the operative clause is consistent with the announced purpose.” Ante, at 578. That is not how this Court ordinarily reads such texts, and it is not how the preamble would have been viewed at the time the Amendment was adopted. While the Court makes the novel suggestion that it need only find some “logical connection” between the preamble and the operative provision, it does acknowledge that a prefatory clause may resolve an ambiguity in the text. Ante, at 577.[7] Without *644 identifying any language in the text that even mentions civilian uses of firearms, the Court proceeds to “find” its preferred reading in what is at best an ambiguous text, and then concludes that its reading is not foreclosed by the preamble. Perhaps the Court’s approach to the text is acceptable advocacy, but it is surely an unusual approach for judges to follow.

“[TJhe right of the people”

The centerpiece of the Court’s textual argument is its insistence that the words “the people” as used in the Second Amendment must have the same meaning, and protect the same class of individuals, as when they are used in the First and Fourth Amendments. According to the Court, in all three provisions — as well as the Constitution’s preamble, § 2 of Article I, and the Tenth Amendment — “the term unambiguously refers to all members of the political community, not an unspecified subset.” Ante, at 580. But the Court itself reads the Second Amendment to protect a “subset” significantly narrower than the class of persons protected by the First and Fourth Amendments; when it finally drills down on the substantive meaning of the Second Amendment, the Court limits the protected class to “law-abiding, responsible citizens,” ante, at 635. But the class of persons protected by the First and Fourth Amendments is not so limited; for even felons (and presumably irresponsible citizens as well) may invoke the protections of those constitutional provisions. The Court offers no way to harmonize its conflicting pronouncements.
*645 The Court also overlooks the significance of the way the Framers used the phrase “the people” in these constitutional provisions. In the First Amendment, no words define the class of individuals entitled to speak, to publish, or to worship; in that Amendment it is only the right peaceably to assemble, and to petition the Government for a redress of grievances, that is described as a right of “the people.” These rights contemplate collective action. While the right peaceably to assemble protects the individual rights of those persons participating in the assembly, its concern is with action engaged in by members of a group, rather than any single individual. Likewise, although the act of petitioning the Government is a right that can be exercised by individuals, it is primarily collective in nature. For if they are to be effective, petitions must involve groups of individuals acting in concert.
Similarly, the words “the people” in the Second Amendment refer back to the object announced in the Amendment’s preamble. They remind us that it is the collective action of individuals having a duty to serve in the militia that the text directly protects and, perhaps more importantly, that the ultimate purpose of the Amendment was to protect the States’ share of the divided sovereignty created by the Constitution.
As used in the Fourth Amendment, “the people” describes the class of persons protected from unreasonable searches and seizures by Government officials. It is true that the Fourth Amendment describes a right that need not be exercised in any collective sense. But that observation does not settle the meaning of the phrase “the people” when used in the Second Amendment. For, as we have seen, the phrase means something quite different in the Petition and Assembly Clauses of the First Amendment. Although the abstract definition of the phrase “the people” could carry the same meaning in the Second Amendment as in the Fourth Amendment, the preamble of the Second Amendment suggests that the uses of the phrase in the First and Second Amendments *646 are the same in referring to a collective activity. By way of contrast, the Fourth Amendment describes a right against governmental interference rather than an affirmative right to engage in protected conduct, and so refers to a right to protect a purely individual interest. As used in the Second Amendment, the words “the people” do not enlarge the right to keep and bear arms to encompass use or ownership of weapons outside the context of service in a well-regulated militia.

“[T]o keep and bear Arms”

Although the Court’s discussion of these words treats them as two “phrases” — as if they read “to keep” and “to bear” — they describe a unitary right: to possess arms if needed for military purposes and to use them in conjunction with military activities.
As a threshold matter, it is worth pausing to note an oddity in the Court’s interpretation of “to keep and bear Arms.” Unlike the Court of Appeals, the Court does not read that phrase to create a right to possess arms for “lawful, private purposes.” Parker v. District of Columbia, 478 F. 3d 370, 382 (CADC 2007). Instead, the Court limits the Amendment’s protection to the right “to possess and carry weapons in case of confrontation.” Ante, at 592. No party or amicus urged this interpretation; the Court appears to have fashioned it out of whole cloth. But although this novel limitation lacks support in the text of the Amendment, the Amendment’s text does justify a different limitation: The “right to keep and bear Arms” protects only a right to possess and use firearms in connection with service in a state-organized militia.
The term “bear arms” is a familiar idiom; when used unadorned by any additional words, its meaning is “to serve as a soldier, do military service, fight.” 1 Oxford English Dictionary 634 (2d ed. 1989). It is derived from the Latin arma ferre, which, translated literally, means “to bear [ferre] war equipment [arma]” Brief for Professors of *647 Linguistics and English as Amici Curiae 19. One 18th-century dictionary defined “arms” as “[w]eapons of offence, or armour of defence,” 1 S. Johnson, A Dictionary of the English Language (1755), and another contemporaneous source explained that “[b]y arms, we understand those instruments of offence generally made use of in war; such as firearms, swords, &c. By weapons, we more particularly mean instruments of other kinds (exclusive of fire-arms), made use of as offensive, on special occasions.” 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1794).[8] Had the Framers wished to expand the meaning of the phrase “bear arms” to encompass civilian possession and use, they could have done so by the addition of phrases such as “for the defense of themselves,” as was done in the Pennsylvania and Vermont Declarations of Rights. The unmodified use of “bear arms,” by contrast, refers most naturally to a military purpose, as evidenced by its use in literally dozens of contemporary texts.[9] The ab *648 sence of any reference to civilian uses of weapons tailors the text of the Amendment to the purpose identified in its preamble.[10] But when discussing these words, the Court simply ignores the preamble.
*649 The Court argues that a “qualifying phrase that contradicts the word or phrase it modifies is unknown this side of the looking glass.” Ante, at 589. But this fundamentally fails to grasp the point. The stand-alone phrase “bear arms” most naturally conveys a military meaning unless the addition of a qualifying phrase signals that a different meaning is intended. When, as in this case, there is no such qualifier, the most natural meaning is the military one; and, in the absence of any qualifier, it is all the more appropriate to look to the preamble to confirm the natural meaning of the text. [11] The Court’s objection is particularly puzzling in light of its own contention that the addition of the modifier “against” changes the meaning of “bear arms.” Compare *650 ante, at 584 (defining “bear arms” to mean “carrying [a weapon] for a particular purpose — confrontation”), with ante, at 586 (“The phrase ‘bear Arms’ also had at the time of the founding an idiomatic meaning that was significantly different from its natural meaning: to serve as a soldier, do military service, fight or to wage war. But it unequivocally bore that idiomatic meaning only when followed by the preposition ‘against’ ” (emphasis deleted; citations and some internal quotation marks omitted)).
The Amendment’s use of the term “keep” in no way contradicts the military meaning conveyed by the phrase “bear arms” and the Amendment’s preamble. To the contrary, a number of state militia laws in effect at the time of the Second Amendment’s drafting used the term “keep” to describe the requirement that militia members store their arms at their homes, ready to be used for service when necessary. The Virginia military law, for example, ordered that “every one of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer.” Act ... for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § III, p. 2 (emphasis added).[12] “[K]eep and bear arms” thus per *651 fectly describes the responsibilities of a framing-era militia member.
This reading is confirmed by the fact that the clause protects only one right, rather than two. It does not describe a right “to keep ... Arms” and a separate right “to bear . .. Arms.” Rather, the single right that it does describe is both a duty and a right to have arms available and ready for military service, and to use them for military purposes when necessary.[13] Different language surely would have been used to protect nonmilitary use and possession of weapons from regulation if such an intent had played any role in the drafting of the Amendment.
* * *
When each word in the text is given full effect, the Amendment is most naturally read to secure to the people a right to use and possess arms in conjunction with service in a well-regulated militia. So far as appears, no more than that was contemplated by its drafters or is encompassed within its terms. Even if the meaning of the text were genuinely susceptible to more than one interpretation, the burden would remain on those advocating a departure from the purpose identified in the preamble and from settled law to come forward with persuasive new arguments or evidence. The textual analysis offered by respondent and embraced by *652 the Court falls far short of sustaining that heavy burden.[14] And the Court’s emphatic reliance on the claim “that the Second Amendment . . . codified a pre-existing right,” ante, at 592, is of course beside the point because the right to keep and bear arms for service in a state militia was also a preexisting right.
Indeed, not a word in the constitutional text even arguably supports the Court’s overwrought and novel description of the Second Amendment as “elevat[ing] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” Ante, at 635.
II
The proper allocation of military power in the new Nation was an issue of central concern for the Framers. The compromises they ultimately reached, reflected in Article I’s Militia Clauses and the Second Amendment, represent quintessential examples of the Framers’ “splitting] the atom of sovereignty.”[15]
*653 Two themes relevant to our current interpretive task ran through the debates on the original Constitution. “On the one hand, there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States.” Perpich v. Department of Defense, 496 U. S. 334, 340 (1990).[16] Governor Edmund Randolph, reporting on the Constitutional Convention to the Virginia Ratification Convention, explained: “With respect to a standing army, I believe there was not a member in the federal Convention, who did not feel indignation at such an institution.” 3 J. Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution 401 (2d ed. 1863) (hereinafter Elliot). On the other hand, the Framers recognized the dangers inherent in relying on inadequately trained militia members “as the primary means of providing for the common defense,” Perpich, 496 U. S., at 340; during the Revolutionary War, “[t]his force, though armed, was largely untrained, and its deficiencies were the subject of bitter complaint.” Wiener, The Militia Clause of the Constitution, 54 Harv. L. Rev. 181, 182 (1940).[17] *654 In order to respond to those twin concerns, a compromise was reached: Congress would be authorized to raise and support a national Army[18] and Navy, and also to organize, arm, discipline, and provide for the calling forth of “the Militia.” U. S. Const., Art. I, § 8, cls. 12-16. The President, at the same time, was empowered as the “Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States.” Art. II, §2. But, with respect to the militia, a significant reservation was made to the States: Although Congress would have the power to call forth,[19] organize, arm, and discipline the militia, as well as to govern “such Part of them as may be employed in the Service of the United States,” the States respectively would retain the right to appoint the officers and to train the militia in accordance with the discipline prescribed by Congress. Art. I, § 8, cl. 16.[20]
*655 But the original Constitution’s retention of the militia and its creation of divided authority over that body did not prove sufficient to allay fears about the dangers posed by a standing army. For it was perceived by some that Article I contained a significant gap: While it empowered Congress to organize, arm, and discipline the militia, it did not prevent Congress from providing for the militia’s disarmament. As George Mason argued during the debates in Virginia on the ratification of the original Constitution:
“The militia may be here destroyed by that method which has been practised in other parts of the world before; that is, by rendering them useless — by disarming them. Under various pretences, Congress may neglect to provide for arming and disciplining the militia; and the state governments cannot do it, for Congress has the exclusive right to arm them.” 3 Elliot 379.
This sentiment was echoed at a number of state ratification conventions; indeed, it was one of the primary objections to the original Constitution voiced by its opponents. The Antifederalists were ultimately unsuccessful in persuading state ratification conventions to condition their approval of the Constitution upon the eventual inclusion of any particular amendment. But a number of States did propose to the first Federal Congress amendments reflecting a desire to ensure that the institution of the militia would remain protected under the new Government. The proposed amendments sent by the States of Virginia, North Carolina, and New York focused on the importance of preserving the state militias and reiterated the dangers posed by standing armies. New Hampshire sent a proposal that differed significantly from the others; while also invoking the dangers of a standing army, it suggested that the Constitution should more broadly protect the use and possession of weapons, without tying such a guarantee expressly to the maintenance of the militia. The States of Maryland, Pennsylvania, and *656 Massachusetts sent no relevant proposed amendments to Congress, but in each of those States a minority of the delegates advocated related amendments. While the Maryland minority proposals were exclusively concerned with standing armies and conscientious objectors, the unsuccessful proposals in both Massachusetts and Pennsylvania would have protected a more broadly worded right, less clearly tied to service in a state militia. Faced with all of these options, it is telling that James Madison chose to craft the Second Amendment as he did.
The relevant proposals sent by the Virginia Ratifying Convention read as follows:
“17th. That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural, and safe defence of a free state; that standing armies, in time of peace, are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the community will admit; and that, in all cases, the military should be under strict subordination to, and be governed by, the civil power.” Id., at 659.
“19th. That any person religiously scrupulous of bearing arms ought to be exempted, upon payment of an equivalent to employ another to bear arms in his stead.” Ibid.
North Carolina adopted Virginia’s proposals and sent them to Congress as its own, although it did not actually ratify the original Constitution until Congress had sent the proposed Bill of Rights to the States for ratification. 2 Schwartz 932-933; see The Complete Bill of Rights 182-183 (N. Cogan ed. 1997) (hereinafter Cogan).
New York produced a proposal with nearly identical language. It read:
*657 “That the people have a' right to keep and bear Arms; that a well regulated Militia, including the body of the People capable of bearing Arms, is the proper, natural and safe defence of a free State. . . . That standing Armies, in time of Peace, are dangerous to Liberty, and ought not to be kept up, except in Cases of necessity; and that at all times, the Military should be kept under strict Subordination to the civil Power.” 2 Schwartz 912.
Notably, each of these proposals used the phrase “keep and bear arms,” which was eventually adopted by Madison. And each proposal embedded the phrase within a group of principles that are distinctly military in meaning.[21]
By contrast, New Hampshire’s proposal, although it followed another proposed amendment that echoed the familiar concern about standing armies,[22] described the protection involved in more clearly personal terms. Its proposal read:
“Twelfth, Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion.” Id., at 758, 761.
The proposals considered in the other three States, although ultimately rejected by their respective ratification *658 conventions, are also relevant to our historical inquiry. First, the Maryland proposal, endorsed by a minority of the delegates and later circulated in pamphlet form, read:
“4. That no standing army shall be kept up in time of peace, unless with the consent of two thirds of the members present of each branch of Congress.
“10. That no person conscientiously scrupulous of bearing arms, in any case, shall be compelled personally to serve as a soldier.” Id., at 729, 735.
The rejected Pennsylvania proposal, which was later incorporated into a critique of the Constitution titled “The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787,” signed by a minority of the State’s delegates (those who had voted against ratification of the Constitution), id., at 628, 662, read:
“7. That the people have a right to bear arms for the defense of themselves and their own State, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to, and be governed by the civil powers.” Id., at 665.
Finally, after the delegates at the Massachusetts Ratification Convention had compiled a list of proposed amendments and alterations, a motion was made to add to the list the following language: “that the said Constitution be never construed to authorize Congress to . . . prevent the people of the United States, who are peaceable citizens, from keeping their own arms.” Cogan 181. This motion, however, failed to achieve the necessary support, and the proposal was ex- *659 eluded from the list of amendments the State sent to Congress. 2 Schwartz 674-675.
Madison, charged with the task of assembling the proposals for amendments sent by the ratifying States, was the principal draftsman of the Second Amendment.[23] He had before him, or at the very least would have been aware of, all of these proposed formulations. In addition, Madison had been a member, some years earlier, of the committee tasked with drafting the Virginia Declaration of Rights. That committee considered a proposal by Thomas Jefferson that would have included within the Virginia Declaration the following language: “No freeman shall ever be debarred the use of arms [within his own lands or tenements].” 1 Papers of Thomas Jefferson 363 (J. Boyd ed. 1950). But the committee rejected that language, adopting instead the provision drafted by George Mason.[24]
With all of these sources upon which to draw, it is strikingly significant that Madison’s first draft omitted any mention of nonmilitary use or possession of weapons. Rather, his original draft repeated the essence of the two proposed amendments sent by Virginia, combining the substance of the two provisions succinctly into one, which read: “The *660 right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country; but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person.” Cogan 169.
Madison’s decision to model the Second Amendment on the distinctly military Virginia proposal is therefore revealing, since it is clear that he considered and rejected formulations that would have unambiguously protected civilian uses of firearms. When Madison prepared his first draft, and when that draft was debated and modified, it is reasonable to assume that all participants in the drafting process were fully aware of the other formulations that would have protected civilian use and possession of weapons and that their choice to craft the Amendment as they did represented a rejection of those alternative formulations.
Madison’s initial inclusion of an exemption for conscientious objectors sheds revelatory light on the purpose of the Amendment. It confirms an intent to describe a duty as well as a right, and it unequivocally identifies the military character of both. The objections voiced to the conscientious-objector clause only confirm the central meaning of the text. Although records of the debate in the Senate, which is where the conscientious-objector clause was removed, do not survive, the arguments raised in the House illuminate the perceived problems with the clause: Specifically, there was concern that Congress “can declare who are those religiously scrupulous, and prevent them from bearing arms.”[25] The ultimate removal of the clause, therefore, only serves to confirm the purpose of the Amendment — to protect *661 against congressional disarmament, by whatever means, of the States’ militias.
The Court also contends that because “Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever,” ante, at 590, the inclusion of a conscientious-objector clause in the original draft of the Amendment does not support the conclusion that the phrase “bear Arms” was military in meaning. But that claim cannot be squared with the record. In the proposals cited supra, at 656, both Virginia and North Carolina included the following language: “That any person religiously scrupulous of bearing arms ought to be exempted, upon payment of an equivalent to employ another to bear arms in his stead” (emphasis added).[26] There is no plausible argument that the use of “bear arms” in those provisions was not unequivocally and exclusively military: The State simply does not compel its citizens to carry arms for the purpose of private “confrontation,” ante, at 584, or for self-defense.
The history of the adoption of the Amendment thus describes an overriding concern about the potential threat to state sovereignty that a federal standing army would pose, and a desire to protect the States’ militias as the means by which to guard against that danger. But state militias could not effectively check the prospect of a federal standing army so long as Congress retained the power to disarm them, and so a guarantee against such disarmament was needed.[27] As we explained in Miller: “With obvious purpose to assure the continuation and render possible the effectiveness of such *662 forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view.” 307 U. S., at 178. The evidence plainly refutes the claim that the Amendment was motivated by the Framers’ fears that Congress might act to regulate any civilian uses of weapons. And even if the historical record were genuinely ambiguous, the burden would remain on the parties advocating a change in the law to introduce facts or arguments “ ‘newly ascertained,’ ” Vasquez, 474 U. S., at 266; the Court is unable to identify any such facts or arguments.
Ill
Although it gives short shrift to the drafting history of the Second Amendment, the Court dwells at length on four other sources: the 17th-century English Bill of Rights; Blackstone’s Commentaries on the Laws of England; postenactment commentary on the Second Amendment; and post-Civil War legislative history.[28] All of these sources shed only indirect light on the question before us, and in any event offer little support for the Court’s conclusion.[29]

*663
The English Bill of Rights

The Court’s reliance on Article VII of the 1689 English Bill of Rights—which, like most of the evidence offered by the Court today, was considered in Miller[30]—is misguided *664 both because Article VII was enacted in response to different concerns from those that motivated the Framers of the Second Amendment, and because the guarantees of the two provisions were by no means coextensive. Moreover, the English text contained no preamble or other provision identifying a narrow, militia-related purpose.
The English Bill of Rights responded to abuses by the Stuart monarchs; among the grievances set forth in the Bill of Rights was that the King had violated the law “[b]y causing several good Subjects being Protestants to be disarmed at the same time when Papists were both armed and Employed contrary to Law.” L. Sehwoerer, The Declaration of Rights, 1689, App. 1, p. 295 (1981). Article VII of the Bill of Rights was a response to that selective disarmament; it guaranteed that “the Subjects which are Protestants may have Armes for their defence Suitable to their condition and as allowed by Law.” Id., at 297. This grant did not establish a general right of all persons, or even of all Protestants, to possess weapons. Rather, the right was qualified in two distinct ways: First, it was restricted to those of adequate social and economic status (“suitable to their Condition”); second, it was only available subject to regulation by Parliament (“as allowed by Law”).[31]
The Court may well be correct that the English Bill of Rights protected the right of some English subjects to use some arms for personal self-defense free from restrictions by the Crown (but not Parliament). But that right — adopted *665 in a different historical and political context and framed in markedly different language — tells us little about the meaning of the Second Amendment.

Blackstone’s Commentaries

The Court’s reliance on Blaekstone’s Commentaries on the Laws of England is unpersuasive for the same reason as its reliance on the English Bill of Rights. Blackstone’s invocation of “‘the natural right of resistance and self-preservation,’ ” ante, at 594, and “ ‘the right of having and using arms for self-preservation and defence,’” ibid., referred specifically to Article VII in the English Bill of Rights. The excerpt from Blackstone offered by the Court, therefore, is, like Article VII itself, of limited use in interpreting the very differently worded, and differently historically situated, Second Amendment.
What is important about Blackstone is the instruction he provided on reading the sort of text before us today. Blackstone described an interpretive approach that gave far more weight to preambles than the Court allows. Counseling that “[t]he fairest and most rational method to interpret the will of the legislator, is by exploring his intentions at the time when the law was made, by signs the most natural and probable,” Blackstone explained: “If words happen to be still dubious, we may establish their meaning from the context; with which it may be of singular use to compare a word, or a sentence, whenever they are ambiguous, equivocal, or intricate. Thus, the proeme, or preamble, is often called in to help the construction of an act of parliament.” 1 Commentaries on the Laws of England 59-60 (1765). In light of the Court’s invocation of Blackstone as “ ‘the preeminent authority on English law for the founding generation,’ ” ante, at 593-594 (quoting Alden v. Maine, 527 U. S. 706, 715 (1999)), its disregard for his guidance on matters of interpretation is striking.

*666
Postenactment Commentary

The Court also excerpts, without any real analysis, commentary by a number of additional scholars, some near in time to the framing and others postdating it by close to a century. Those scholars are for the most part of limited relevance in construing the guarantee of the Second Amendment: Their views are not altogether clear,[32] they tended to collapse the Second Amendment with Article VII of the Eng *667 lish Bill of Rights, and they appear to have been unfamiliar with the drafting history of the Second Amendment.[33]
The most significant of these commentators was Joseph Story. Contrary to the Court’s assertions, however, Story actually supports the view that the Amendment was designed to protect the right of each of the States to maintain a well-regulated militia. When Story used the term “palladium” in discussions of the Second Amendment, he merely echoed the concerns that animated the Framers of the Amendment and led to its adoption. An excerpt from his 1833 Commentaries on the Constitution of the United States — the same passage cited by the Court in Miller[34]— merits reproducing at some length:
“The importance of [the Second Amendment] will scarcely be doubted by any persons who have duly reflected upon the subject. The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rulers. It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses with which they are attended and the facile means which they afford to ambitious and unprincipled rulers to subvert the government, or trample upon the rights of the people. The right of the citizens to keep and bear arms has justly been considered as the *668 palladium of the liberties of a republic, since it offers a strong moral check against the usurpation and arbitrary power of rulers, and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them. And yet, though this truth would seem so clear, and the importance of a well-regulated militia would seem so undeniable, it cannot be disguised that, among the American people, there is a growing indifference to any system of militia discipline, and a strong disposition, from a sense of its burdens, to be rid of all regulations. How it is practicable to keep the people duly armed without some organization, it is difficult to see. There is certainly no small danger that indifference may lead to disgust, and disgust to contempt; and thus gradually undermine all the protection intended by the clause of our national bill of rights.” 2 J. Story, Commentaries on the Constitution of the United States § 1897, pp. 620-621 (4th ed. 1873) (footnote omitted).
Story thus began by tying the significance of the Amendment directly to the paramount importance of the militia. He then invoked the fear that drove the Framers of the Second Amendment — specifically, the threat to liberty posed by a standing army. An important check on that danger, he suggested, was a “well-regulated militia,” id., at 621, for which he assumed that arms would have to be kept and, when necessary, borne. There is not so much as a whisper in the passage above that Story believed that the right secured by the Amendment bore any relation to private use or possession of weapons for activities like hunting or personal self-defense.
After extolling the virtues of the militia as a bulwark against tyranny, Story went on to decry the “growing indifference to any system of militia discipline.” Ibid. When he wrote, “[h]ow it is practicable to keep the people duly armed without some organization it is difficult to see,” ibid., he un *669 derscored the degree to which he viewed the arming of the people and the militia as indissolubly linked. Story warned that the “growing indifference” he perceived would “gradually undermine all the protection intended by this clause of our national bill of rights,” ibid. In his view, the importance of the Amendment was directly related to the continuing vitality of an institution in the process of apparently becoming obsolete.
In an attempt to downplay the absence of any reference to nonmilitary uses of weapons in Story’s commentary, the Court relies on the fact that Story characterized Article VII of the English Declaration of Rights as a “‘similar provision,”’ ante, at 608. The two provisions were indeed similar, in that both protected some uses of firearms. But Story’s characterization in no way suggests that he believed that the provisions had the same scope. To the contrary, Story’s exclusive focus on the militia in his discussion of the Second Amendment confirms his understanding of the right protected by the Second Amendment as limited to military uses of arms.
Story’s writings as a Justice of this Court, to the extent that they shed light on this question, only confirm that Justice Story did not view the Amendment as conferring upon individuals any “self-defense” right disconnected from service in a state militia. Justice Story dissented from the Court’s decision in Houston v. Moore, 5 Wheat. 1, 24 (1820), which held that a state court “had a concurrent jurisdiction” with the federal courts “to try a militia man who had disobeyed the call of the President, and to enforce the laws of Congress against such delinquent.” Id., at 32. Justice Story believed that Congress’ power to provide for the organizing, arming, and disciplining of the militia was, when Congress acted, plenary; but he explained that in the absence of congressional action, “I am certainly not prepared to deny the legitimacy of such an exercise of [state] authority.” Id., at 52. As to the Second Amendment, he wrote that it “may *670 not, perhaps, be thought to have any important bearing on this point. If it have, it confirms and illustrates, rather than impugns the reasoning already suggested.” Id., at 52-53. The Court contends that had Justice Story understood the Amendment to have a militia purpose, the Amendment would have had “enormous and obvious bearing on the point.” Ante, at 610. But the Court has it quite backwards: If Story had believed that the purpose of the Amendment was to permit civilians to keep firearms for activities like personal self-defense, what “confirm[ation] and illustration],” Houston, 5 Wheat., at 53, could the Amendment possibly have provided for the point that States retained the power to organize, arm, and discipline their own militias?

Post-Civil War Legislative History

The Court suggests that by the post-Civil War period, the Second Amendment was understood to secure a right to firearm use and ownership for purely private purposes like personal self-defense. While it is true that some of the legislative history on which the Court relies supports that contention, see ante, at 614-616, such sources are entitled to limited, if any, weight. All of the statements the Court cites were made long after the framing of the Amendment and cannot possibly supply any insight into the intent of the Framers; and all were made during pitched political debates, so that they are better characterized as advocacy than good-faith attempts at constitutional interpretation.
What is more, much of the evidence the Court offers is decidedly less clear than its discussion allows. The Court notes: “Blacks were routinely disarmed by Southern States after the Civil War. Those who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms.” Ante, at 614. The Court hastily concludes that “[n]eedless to say, the claim was not that blacks were being prohibited from carrying arms in an organized state militia,” ibid. But some of the claims of the *671 sort the Court cites may have been just that. In some Southern States, Reconstruction-era Republican governments created state militias in which both blacks and whites were permitted to serve. Because “[t]he decision to allow blacks to serve alongside whites meant that most southerners refused to join the new militia,” the bodies were dubbed “‘Negro militia[s].’’’ S. Cornell, A Well-Regulated Militia 177 (2006). The “arming of the Negro militias met with especially fierce resistance in South Carolina. .. . The sight of organized, armed freedmen incensed opponents of Reconstruction and led to an intensified campaign of Klan terror. Leading members of the Negro militia were beaten or lynched and their weapons stolen.” Id., at 176-177.
One particularly chilling account of Reconstruction-era Klan violence directed at a black militia member is recounted in the memoir of Louis F. Post, A “Carpetbagger” in South Carolina, 10 Journal of Negro History 10 (1925). Post describes the murder by local Klan members of Jim Williams, the captain of a “Negro militia company,” id., at 59, this way:
“[A] cavalcade of sixty cowardly white men, completely disguised with face masks and body gowns, rode up one night in March, 1871, to the house of Captain Williams ... in the wood [they] hanged [and shot] him . . . [and on his body they] then pinned a slip of paper inscribed, as I remember it, with these grim words: ‘Jim Williams gone to his last muster.’ ” Id., at 61.
In light of this evidence, it is quite possible that at least some of the statements on which the Court relies actually did mean to refer to the disarmament of black militia members.
IV
The brilliance of the debates that resulted in the Second Amendment faded into oblivion during the ensuing years, for the concerns about Article I’s Militia Clauses that generated such pitched debate during the ratification process and led to the adoption of the Second Amendment were short lived.
*672 In 1792, the year after the Amendment was ratified, Congress passed a statute that purported to establish “an Uniform Militia throughout the United States.” 1 Stat. 271. The statute commanded every able-bodied white male citizen between the ages of 18 and 45 to be enrolled therein and to “provide himself with a good musket or firelock” and other specified weaponry.[35] Ibid. The statute is significant, for it confirmed the way those in the founding generation viewed firearm ownership: as a duty linked to military service. The statute they enacted, however, “was virtually ignored for more than a century,” and was finally repealed in 1901. See Perpich, 496 U. S., at 341.
The postratification history of the Second Amendment is strikingly similar. The Amendment played little role in any legislative debate about the civilian use of firearms for most of the 19th century, and it made few appearances in the decisions of this Court. Two 19th-century cases, however, bear mentioning.
In United States v. Cruikshank, 92 U. S. 542 (1876), the Court sustained a challenge to respondents’ convictions under the Enforcement Act of 1870 for conspiring to deprive any individual of “ ‘any right or privilege granted or secured to him by the constitution or laws of the United States.’” Id., at 548. The Court wrote, as to counts 2 and 10 of respondents’ indictment:
“The right there specified is that of ‘bearing arms for a lawful purpose.’ This is not a right granted by the Constitution. Neither is it in any manner dependent on *673 that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government.” Id., at 553.
The majority’s assertion that the Court in Cruikshank “described the right protected by the Second Amendment as “bearing arms for a lawful purpose,” ’ ” ante, at 620 (quoting Cruikshank, 92 U. S., at 553), is not accurate. The Cruikshank Court explained that the defective indictment contained such language, but the Court did not itself describe the right, or endorse the indictment’s description of the right.
Moreover, it is entirely possible that the basis for the indictment’s counts 2 and 10, which charged respondents with depriving the victims of rights secured by the Second Amendment, was the prosecutor’s belief that the victims— members of a group of citizens, mostly black but also white, who were rounded up by the sheriff, sworn in as a posse to defend the local courthouse, and attacked by a white mob— bore sufficient resemblance to members of a state militia that they were brought within the reach of the Second Amendment. See generally C. Lane, The Day Freedom Died: The Colfax Massacre, The Supreme Court, and the Betrayal of Reconstruction (2008).
Only one other 19th-century case in this Court, Presser v. Illinois, 116 U. S. 252 (1886), engaged in any significant discussion of the Second Amendment. The petitioner in Presser was convicted of violating a state statute that prohibited organizations other than the Illinois National Guard from associating together as military companies or parading with arms. Presser challenged his conviction, asserting, as relevant, that the statute violated both the Second and *674 the Fourteenth Amendments. With respect to the Second Amendment, the Court wrote:
“We think it clear that the sections under consideration, which only forbid bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, do not infringe the right of the people to keep and bear arms. But a conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of Congress and the National government, and not upon that of the States.” Id., at 264-265.
And in discussing the Fourteenth Amendment, the Court explained:
“The plaintiff in error was not a member of the organized volunteer militia of the State of Illinois, nor did he belong to the troops of the United States or to any organization under the militia law of the United States. On the contrary, the fact that he did not belong to the organized militia or the troops of the United States was an ingredient in the offence for which he was convicted and sentenced. The question is, therefore, had he a right as a citizen of the United States, in disobedience of the State law, to associate with others as a military company, and to drill and parade with arms in the towns and cities of the State? If the plaintiff in error has any such privilege he must be able to point to the provision of the Constitution or statutes of the United States by which it is conferred.” Id., at 266.
Presser, therefore, both affirmed Cruikskank’s holding that the Second Amendment posed no obstacle to regulation by state governments, and suggested that in any event nothing in the Constitution protected the use of arms outside the *675 context of a militia “authorized by law” and organized by the State or Federal Government.[36]
In 1901, the President revitalized the militia by creating “‘the National Guard of the several States/” Perpick, 496 U. S., at 341, and nn. 9-10; meanwhile, the dominant understanding of the Second Amendment’s inapplicability to private gun ownership continued well into the 20th century. The first two federal laws directly restricting civilian use and possession of firearms—the 1927 Act prohibiting mail delivery of “pistols, revolvers, and other firearms capable of being concealed on the person,” eh. 75,44 Stat. 1059, and the 1934 Act prohibiting the possession of sawed-off shotguns and machineguns — were enacted over minor Second Amendment objections dismissed by the vast majority of the legislators who participated in the debates.[37] Members of Congress clashed over the wisdom and efficacy of such laws as crime-control measures. But since the statutes did not in *676 fringe upon the military use or possession of weapons, for most legislators they did not even raise the specter of possible conflict with the Second Amendment.
Thus, for most of our history, the invalidity of Second-Amendment-based objections to firearms regulations has been well settled and uncontroversial.[38] Indeed, the Second Amendment was not even mentioned in either full House of Congress during the legislative proceedings that led to the passage of the 1934 Act. Yet enforcement of that law produced the judicial decision that confirmed the status of the Amendment as limited in reach to military usage. After reviewing many of the same sources that are discussed at *677 greater length by the Court today, the Miller Court unanimously concluded that the Second Amendment did not apply to the possession of a firearm that did not have “some reasonable relationship to the preservation or efficiency of a well regulated militia.” 307 U. S., at 178.
The key to that decision did not, as the Court belatedly suggests, ante, at 622-625, turn on the difference between muskets and sawed-off shotguns; it turned, rather, on the basic difference between the military and nonmilitary use and possession of guns. Indeed, if the Second Amendment were not limited in its coverage to military uses of weapons, why should the Court in Miller have suggested that some weapons but not others were eligible for Second Amendment protection? If use for self-defense were the relevant standard, why did the Court not inquire into the suitability of a particular weapon for self-defense purposes?
Perhaps in recognition of the weakness of its attempt to distinguish Miller, the Court argues in the alternative that Miller should be discounted because of its decisional history. It is true that the appellees in Miller did not file a brief or make an appearance, although the court below had held that the relevant provision of the National Firearms Act violated the Second Amendment (albeit without any reasoned opinion). But, as our decision in Marbury v. Madison, 1 Cranch 137, in which only one side appeared and presented arguments, demonstrates, the absence of adversarial presentation alone is not a basis for refusing to accord stare decisis effect to a decision of this Court. See Bloch, Marbury Redux, in Arguing Marbury v. Madison 59, 63 (M. Tushnet ed. 2005). Of course, if it can be demonstrated that new evidence or arguments were genuinely not available to an earlier Court, that fact should be given special weight as we consider whether to overrule a prior case. But the Court does not make that claim, because it cannot. Although it is true that the drafting history of the Amendment was not *678 discussed in the Government’s brief, see ante, at 623-624, it is certainly not the drafting history that the Court’s decision today turns on. And those sources upon which the Court today relies most heavily were available to the Miller Court. The Government cited the English Bill of Rights and quoted a lengthy passage from Aymette v. State, 21 Tenn. 154 (1840), detailing the history leading to the English guarantee, Brief for United States in United States v. Miller, O. T. 1938, No. 696, pp. 12-13; it also cited Blackstone, id., at 9, n. 2, Cooley, id., at 12, 15, and Story, id., at 15. The Court is reduced to critiquing the number of pages the Government devoted to exploring the English legal sources. Only two (in a brief 21 pages in length)! Would the Court be satisfied with four? Ten?
The Court is simply wrong when it intones that Miller contained “not a word” about the Amendment’s history. Ante, at 624. The Court plainly looked to history to construe the term “Militia,” and, on the best reading of Miller, the entire guarantee of the Second Amendment. After noting the original Constitution’s grant of power to Congress and to the States over the militia, the Court explained:
“With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view.
“The Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia— civilians primarily, soldiers on occasion.
“The signification attributed to the term Militia appears from the debates in the Convention, the history *679 and legislation of Colonies and States, and the writings of approved commentators.” Miller, 307 U. S., at 178-179.
The majority cannot seriously believe that the Miller Court did not consider any relevant evidence; the majority simply does not approve of the conclusion the Miller Court reached on that evidence. Standing alone, that is insufficient reason to disregard a unanimous opinion of this Court, upon which substantial reliance has been placed by legislators and citizens for nearly 70 years.
V
The Court concludes its opinion by declaring that it is not the proper role of this Court to change the meaning of rights “enshrine[d]” in the Constitution. Ante, at 636. But the right the Court announces was not “enshrined” in the Second Amendment by the Framers; it is the product of today’s law-changing decision. The majority’s exegesis has utterly failed to establish that as a matter of text or history, “the right of law-abiding, responsible citizens to use arms in defense of hearth and home” is “elevate[d] above all other interests” by the Second Amendment. Ante, at 635.
Until today, it has been understood that legislatures may regulate the civilian use and misuse of firearms so long as they do not interfere with the preservation of a well-regulated militia. The Court’s announcement of a new constitutional right to own and use firearms for private purposes upsets that settled understanding, but leaves for future cases the formidable task of defining the scope of permissible regulations. Today judicial craftsmen have confidently asserted that a policy choice that denies a “law-abiding, responsible citize[n]” the right to keep and use weapons in the home for self-defense is “off the table.” Ante, at 636. Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, *680 I fear that the District’s policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.[39]
I do not know whether today’s decision will increase the labor of federal judges to the “breaking point” envisioned by Justice Cardozo, but it will surely give rise to a far more active judicial role in making vitally important national policy decisions than was envisioned at any time in the 18th, 19th, or 20th centuries.
The Court properly disclaims any interest in evaluating the wisdom of the specific policy choice challenged in this case, but it fails to pay heed to a far more important policy choice — the choice made by the Framers themselves. The Court would have us believe that over 200 years ago, the Framers made a choice to limit the tools available to elected officials wishing to regulate civilian uses of weapons, and to authorize this Court to use the common-law process of case-by-case judicial lawmaking to define the contours of acceptable gun-control policy. Absent compelling evidence that is nowhere to be found in the Court’s opinion, I could not possibly conclude that the Framers made such a choice.
For these reasons, I respectfully dissent.

 There was some limited congressional activity earlier: A 10% federal excise tax on firearms was passed as part of the Revenue Act of 1918, 40 Stat. 1057, and in 1927 a statute was enacted prohibiting the shipment of handguns, revolvers, and other concealable weapons through the United States mails. Ch. 75, 44 Stat. 1059-1060 (hereinafter 1927 Act).

 Until the Fifth Circuit’s decision in United States v. Emerson, 270 F. 3d 203 (2001), every Court of Appeals to consider the question had understood Miller to hold that the Second Amendment does not protect the right to possess and use guns for purely private, civilian purposes. See, e.g., United States v. Haney, 264 F. 3d 1161, 1164-1166 (CA10 2001); United States v. Napier, 233 F. 3d 394, 402-404 (CA6 2000); Gillespie v. Indianapolis, 185 F. 3d 693, 710-711 (CA7 1999); United States v. Scanio, No. 97-1584, 1998 WL 802060, *2 (CA2, Nov. 12, 1998) (unpublished opinion); United States v. Wright, 117 F. 3d 1265, 1271-1274 (CA11 1997); United States v. Rybar, 103 F. 3d 273, 285-286 (CA3 1996); Hickman v. Block, 81 F. 3d 98, 100-103 (CA9 1996); United States v. Hale, 978 F. 2d 1016, 1018-1020 (CA8 1992); Thomas v. City Council of Portland, 730 F. 2d 41, 42 (CA1 1984) (per curiam); United States v. Johnson, 497 F. 2d 548, 550 (CA4 1974) (per curiam); United States v. Johnson, 441 F. 2d 1134, 1136 (CA5 1971); see also Sandidge v. United States, 520 A. 2d 1057, 1058-1059 (DC App. 1987). And a number of courts have remained firm in their prior positions, even after considering Emerson. See, e. g., United States v. Lippman, 369 F. 3d 1039, 1043-1045 (CA8 2004); United States v. Parker, 362 F. 3d 1279, 1282-1284 (CA10 2004); United States v. Jackubowski, 63 Fed.Appx. 959, 961 (CA7 2003) (unpublished opinion); Silveira v. Lockyer, 312 F. 3d 1052, 1060-1066 (CA9 2002); United States v. Milheron, 231 F. Supp. 2d 376, 378 (Me. 2002); Bach v. Pataki, 289 F. Supp. 2d 217, 224-226 (NDNY 2003); United States v. Smith, 56 M. J. 711, 716 (Air Force Ct. Crim. App. 2001).

 Our discussion in Leivis was brief but significant. Upholding a conviction for receipt of a firearm by a felon, we wrote: “These legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties. See United States v. Miller, 307 U. S. 174, 178 (1939) (the Second Amendment guarantees no right to keep and bear a firearm that does not have ‘some reasonable relationship to the preservation or efficiency of a well regulated militia’).” 445 U. S., at 65-66, n. 8.

 See Vasquez v. Hillery, 474 U. S. 254, 265-266 (1986) (“[Stare decisis] permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact. While stare decisis is not an inexorable command, the careful observer will discern that any detours from the straight path of stare decisis in our past have occurred for articulable reasons, and only when the Court has felt obliged ‘to bring its opinions into agreement with experience and with facts newly ascertained.’ Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, 412 (1932) (Brandeis, J., dissenting)”); Pollock v. Farmers’ Loan & Trust Co., 157 U. S. 429, 652 (1895) (White, J., dissenting) (“The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to *640 depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our Constitution will, in my judgment, be bereft of value and become a most dangerous instrument to the rights and liberties of the people”).

 The Virginia Declaration of Rights ¶ 13 (1776) provided: “That a well-regulated Militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State; that Standing Armies, in time of peace, should be avoided, as dangerous to liberty; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power.” 1 B. Schwartz, The Bill of Rights 235 (1971) (hereinafter Schwartz).
Maryland’s Declaration of Rights, Arts. XXV-XXVII (1776), provided: “That a well-regulated militia is the proper and natural defence of a free government”; “That standing armies are dangerous to liberty, and ought not to be raised or kept up, without consent of the Legislature”; “That in all cases, and at all times, the military ought to be under strict subordination to and control of the civil power.” 1 Schwartz 282.
Delaware’s Declaration of Rights §§ 18-20 (1776) provided: “That a well regulated militia is the proper, natural, and safe defence of a free government”; “That standing armies are dangerous to liberty, and ought not to be raised or kept up without the consent of the Legislature”; “That in all cases and at all times the military ought to be under strict subordination to and governed by the civil power.” 1 Schwartz 278.
Finally, New Hampshire’s Bill of Rights, Arts. XXIV-XXVI (1783), read: “A well regulated militia is the proper, natural, and sure defence of a state”; “Standing armies are dangerous to liberty, and ought not to be raised or kept up without consent of the legislature”; “In all cases, and at all times, the military ought to be under strict subordination to, and governed by the civil power.” 1 Schwartz 378. It elsewhere provided: “No person who is conscientiously scrupulous about the lawfulness of bearing arms, shall be compelled thereto, provided he will pay an equivalent.” Id., at 377 (Art. XIII).

 The language of the Amendment’s preamble also closely tracks the language of a number of contemporaneous state militia statutes, many of which began with nearly identical statements. Georgia’s 1778 militia statute, for example, began, “[w]hereas a well ordered and disciplined Militia, is essentially necessary, to the Safety, peace and prosperity, of this State.” Act of Nov. 15, 1778, 19 Colonial Records of the State of Georgia 103 (Can *642 dler ed. 1911 (pt. 2)). North Carolina’s 1777 militia statute started with this language: “[w]jhereas a well regulated Militia is absolutely necessary for the defending and securing the Liberties of a free State.” N. C. Sess. Laws ch. 1, § I, p. 1. And Connecticut’s 1782 “Acts and Laws Regulating the Militia” began, “[w]hereas the Defence and Security of all free States depends (under God) upon the Exertions of a well regulated Militia, and the Laws heretofore enacted have proved inadequate to the End designed.” Conn. Acts and Laws p. 585 (hereinafter 1782 Conn. Acts).
These state militia statutes give content to the notion of a “well-regulated militia.” They identify those persons who compose the State’s militia; they create regiments, brigades, and divisions; they set forth command structures and provide for the appointment of officers; they describe how the militia will be assembled when necessary and provide for training; and they prescribe penalties for nonappearance, delinquency, and failure to keep the required weapons, ammunition, and other necessary equipment. The obligation of militia members to “keep” certain specified arms is detailed further, n. 12, infra, and accompanying text.

 The sources the Court cites simply do not support the proposition that some “logical connection” between the two clauses is all that is required. The Dwarris treatise, for example, merely explains that “[t]he general purview of a statute is not . . . necessarily to be restrained by any words introductory to the enacting clauses.” F. Dwarris, A General Treatise on Statutes 268 (P. Potter ed. 1871) (emphasis added). The treatise proceeds to caution that “the preamble cannot control the enacting part of a statute, which is expressed in clear and unambiguous terms, yet, if any doubt arise on the words of the enacting part, the preamble may be resorted to, to explain it.” Id., at 269. Sutherland makes the same point. Explaining that “[i]n the United States preambles are not as important as they are in *644 England,” the treatise notes that in the United States “the settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms.” 2A N. Singer, Sutherland on Statutory Construction § 47.04, p. 146 (rev. 5th ed. 1992) (emphasis added). Surely not even the Court believes that the Amendment’s operative provision, which, though only 14 words in length, takes the Court the better part of 18 pages to parse, is perfectly “clear and unambiguous.”

 The Court’s repeated citation to the dissenting opinion in Muscarello v. United States, 524 U. S. 125 (1998), ante, at 584, 586, as illuminating the meaning of “bear arms,” borders on the risible. At issue in Muscarello was the proper construction of the word “carries” in 18 U. S. C. § 924(c) (1994 ed.); the dissent in that case made passing reference to the Second Amendment only in the course of observing that both the Constitution and Black’s Law Dictionary suggested that something more active than placement of a gun in a glove compartment might be meant by the phrase “ ‘carries a firearm.’ ” 524 U. S., at 143.

 Amici professors of linguistics and English reviewed uses of the term “bear arms” in a compilation of books, pamphlets, and other sources disseminated in the period between the Declaration of Independence and the adoption of the Second Amendment. See Brief for Professors of Linguistics and English 23-25. Amici determined that of 115 texts that employed the term, all but five usages were in a clearly military context, and in four of the remaining five instances, further qualifying language conveyed a different meaning.
The Court allows that the phrase “bear Arms” did have as an idiomatic meaning, “ ‘to serve as a soldier, do military service, fight,’ ” ante, at 586, but asserts that it “unequivocally bore that idiomatic meaning only when *648 followed by the preposition ‘against,’ which was in turn followed by the target of the hostilities,” ibid. But contemporary sources make clear that the phrase “bear arms” was often used to convey a military meaning without those additional words. See, e. g., To the Printer, Providence Gazette (May 27, 1775) (“By the common estimate of three millions of people in America, allowing one in five to bear arms, there will be found 600,000 fighting men”); Letter of Henry Laurens to the Mass. Council (Jan. 21, 1778), in Letters of Delegates to Congress 1774-1789, p. 622 (P. Smith ed. 1981) (“Congress were yesterday informed . . . that those Canadians who returned from Saratoga... had been compelled by Sir Guy Carleton to bear Arms”); Of the Manner of Making War Among the Indians of North-America, Connecticut Courant (May 23, 1785) (“The Indians begin to bear arms at the age of fifteen, and lay them aside when they arrive at the age of sixty. Some nations to the southward, I have been informed, do not continue their military exercises after they are fifty”); 28 Journals of the Continental Congress 1030 (G. Hunt ed. 1910) (“That hostages be mutually given as a security that the Convention troops and those received in exchange for them do not bear arms prior to the first day of May next”); H. R. J., 9th Cong., 1st Sess., 217 (Feb. 12, 1806) (“Whereas the commanders of British armed vessels have impressed many American seamen, and compelled them to bear arms on board said vessels, and assist in fighting their battles with nations in amity and peace with the United States”); H. R. J., 15th Cong., 2d Sess., 182-183 (Jan. 14,1819) (“[The petitioners] state that they were residing in the British province of Canada, at the commencement of the late war, and that owing to their attachment to the United States, they refused to bear arms, when called upon by the British authorities . .. ”).

Aymette v. State, 21 Tenn. 154, 156 (1840), a case we cited in Miller, further confirms this reading of the phrase. In Aymette, the Tennessee Supreme Court construed the guarantee in Tennessee’s 1834 Constitution that “ ‘the free white men of this State, have a right to keep and bear arms for their common defence.’” Explaining that the provision was adopted with the same goals as the Federal Constitution’s Second Amendment, the court wrote: “The words ‘bear arms’... have reference to their military use, and were not employed to mean wearing them about the person as part of the dress. As the object for which the right to keep and bear arms is secured, is of general and public nature, to be exercised *649 by the people in a body, for their common defence, so the arms, the right to keep which is secured, are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment.” 21 Tenn., at 158. The court elaborated: “[W]e may remark, that the phrase, ‘bear arms' is used in the Kentucky Constitution as well as our own, and implies, as has already been suggested, their military use.... A man in the pursuit of deer, elk, and buffaloes, might carry his rifle every day, for forty years, and, yet, it would never be said of him, that he had borne arms, much less could it be said, that a private citizen bears arms, because he has a dirk or pistol concealed under his clothes, or a spear in a cane.” Id., at 161.

 As lucidly explained in the context of a statute mandating a sentencing enhancement for any person who “uses” a firearm during a crime of violence or drug trafficking crime:
“To use an instrumentality ordinarily means to use it for its intended purpose. When someone asks, ‘Do you use a cane?,’ he is not inquiring whether you have your grandfather’s silver-handled walking stick on display in the hall; he wants to know whether you walk with a cane. Similarly, to speak of ‘using a firearm’ is to speak of using it for its distinctive purpose, i. e., as a weapon. To be sure, one can use a firearm in a number of ways, including as an article of exchange, just as one can ‘use’ a cane as a hall decoration — but that is not the ordinary meaning of ‘using’ the one or the other. The Court does not appear to grasp the distinction between how a word can be used and how it ordinarily is used.” Smith v. United States, 508 U. S. 223,242 (1993) (Scalia, J., dissenting) (some internal quotation marks, footnotes, and citations omitted).

 See also Act for the regulating, training, and arraying of the Militia, ... of the State, 1781 N. J. Laws, ch. XIII, § 12, p. 43 (“And be it Enacted, That each Person enrolled as aforesaid, shall also keep at his Place of Abode one Pound of good merchantable Gunpowder and three Pounds of Ball sized to his Musket or Rifle” (emphasis added)); An Act for establishing a Militia, 1785 Del. Laws § 7, p. 59 (“And be it enacted, That every person between the ages of eighteen and fifty . . . shall at his own expence, provide himself . . . with a musket or firelock, with a bayonet, a cartouch box to contain twenty three cartridges, a priming wire, a brush and six flints, all in good order, on or before the first day of April next, under the penalty of forty shillings, and shall keep the same by him at all times, ready and fit for service, under the penalty of two shillings and six pence for each neglect or default thereof on every muster day” (second emphasis added)); 1782 Conn. Acts p. 590 (“And it shall be the duty of *651 the Regional Quarter-Master to provide and keep a sufficient quantity of Ammunition and warlike stores for the use of their respective Regiments, to be kept in such Place or Places as shall be ordered by the Field Officers” (emphasis added)).

 The Court notes that the First Amendment protects two separate rights with the phrase “the ‘right [singular] of the people peaceably to assemble, and to petition the Government for a redress of grievances.’ ” Ante, at 591. But this only proves the point: In contrast to the language quoted by the Court, the Second Amendment does not protect a “right to keep and to bear arms,” but rather a “right to keep and bear Arms.” The State Constitutions cited by the Court are distinguishable on the same ground.

 The Court’s atomistic, word-by-word approach to construing the Amendment calls to mind the parable of the six blind men and the elephant, famously set in verse by John Godfrey Saxe. The Poems of John Godfrey Saxe 135-136 (1873). In the parable, each blind man approaches a single elephant; touching a different part of the elephant’s body in isolation, each concludes that he has learned its true nature. One touches the animal’s leg, and concludes that the elephant is like a tree; another touches the trunk and decides that the elephant is like a snake; and so on. Each of them, of course, has fundamentally failed to grasp the nature of the creature.

 By “‘splitting] the atom of sovereignty,’” the Framers created ‘“two political capacities, one state and one federal, each protected from incursion by the other. The resulting Constitution created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it.’” Saenz v. Roe, 526 U. S. 489, 504, n. 17 (1999) (quoting U. S. Term Limits, Inc. v. Thornton, 514 U. S. 779, 838 (1995) (Kennedy, J., concurring)).

 Indeed, this was one of the grievances voiced by the colonists: Paragraph 13 of the Declaration of Independence charged of King George, “He has kept among us, in times of peace, Standing Armies without the Consent of our legislatures.”

 George Washington, writing to Congress on September 24, 1776, warned that for Congress “[t]o place any dependance upon Militia, is, assuredly, resting upon a broken staff.” 6 Writings of George Washington 106, 110 (J. Fitzpatrick ed. 1932). Several years later he reiterated this view in another letter to Congress: “Regular Troops alone are equal to the exigencies of modern war, as well for defence as offence .... No Militia will ever acquire the habits necessary to resist a regular force.... The firmness requisite for the real business of fighting is only to be attained by a constant course of discipline and service.” 20 id,., at 49,49-50 (Sept. 15, 1780). And Alexander Hamilton argued this view in many debates. In 1787, he wrote:
“Here I expect we shall be told that the militia of the country is its natural bulwark, and would be at all times equal to the national defense. This doctrine, in substance, had like to have lost us our independ *654 ence. . . . War, like most other things, is a science to be acquired and perfected by diligence, by perseverance, by time, and by practice.” The Federalist No. 25, p. 166 (C. Rossiter ed. 1961).

 “[B]ut no Appropriation of Money to that Use [raising and supporting Armies] shall be for a longer Term than two Years.” U. S. Const., Art. I, § 8, cl. 12.

 This “calling forth” power was only permitted in order for the militia “to execute the Laws of the Union, suppress Insurrections and repel Invasions.” Art. I, § 8, cl. 15.

 The Court assumes — incorrectly, in my view — that even when a state militia was not called into service, Congress would have had the power to exclude individuals from enlistment in that state militia. See ante, at 600. That assumption is not supported by the text of the Militia Clauses of the original Constitution, which confer upon Congress the power to “organiz[e], ar[m], and discipline], the Militia,” Art. I, § 8, cl. 16, but not the power to say who will be members of a state militia. It is also flatly inconsistent with the Second Amendment. The States’ power to create their own militias provides an easy answer to the Court’s complaint that the right as I have described it is empty because it merely guarantees “citizens’ right to use a gun in an organization from which Congress has plenary authority to exclude them.” Ante, at 600.

 In addition to the cautionary references to standing armies and to the importance of civil authority over the military, each of the proposals contained a guarantee that closely resembled the language of what later became the Third Amendment. The 18th proposal from Virginia and North Carolina read: “That no soldier in time of peace ought to be quartered in any house without the consent of the owner, and in time of war in such manner only as the law directs.” 3 Elliot 659. And New York’s language read: “That in time of Peace no Soldier ought to be quartered in any House without the consent of the Owner, and in time of War only by the Civil Magistrate in such manner as the Laws may direct.” 2 Schwartz 912.

 “Tenth, That no standing Army shall be Kept up in time of Peace unless with the consent of three fourths of the Members of each branch of Congress, nor shall Soldiers in Time of Peace be quartered upon private Houses with out the consent of the Owners.” Id., at 761.

 Madison explained in a letter to Richard Peters, Aug. 19, 1789, the paramount importance of preparing a list of amendments to placate those States that had ratified the Constitution in reliance on a commitment that amendments would follow: “In many States the [Constitution] was adopted under a tacit compact in [favor] of some subsequent provisions on this head. In [Virginia], It would have been certainly rejected, had no assurances been given by its advocates that such provisions would be pursued. As an honest man I feel my self bound by this consideration.” Creating the Bill of Rights 281, 282 (H. Veit, K. Bowling, & C. Bickford eds. 1991) (hereinafter Veit).

 The adopted language, Virginia Declaration of Rights ¶ 13 (1776), read as follows: “That a well-regulated Militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State; that Standing Armies, in time of peace, should be avoided as dangerous to liberty; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power.” 1 Schwartz 235.

 Veit 182. This was the objection voiced by Elbridge Gerry, who went on to remark, in the next breath: “What, sir, is the use of a militia? It is to prevent the establishment of a standing army, the bane of liberty. . . . Whenever government mean to invade the rights and liberties of the people, they always attempt to destroy the militia, in order to raise an army upon their ruins.” Ibid.

 The failed Maryland proposals contained similar language. See supra, at 656.

 The Court suggests that this historical analysis casts the Second Amendment as an “odd outlier,” ante, at 603; if by “outlier,” the Court means that the Second Amendment was enacted in a unique and novel context, and responded to the particular challenges presented by the Framers’ federalism experiment, I have no quarrel with the Court’s eharacterizati on.

 The Court’s fixation on the last two types of sources is particularly puzzling, since both have the same characteristics as postenactment legislative history, which is generally viewed as the least reliable source of authority for ascertaining the intent of any provision’s drafters. As has been explained:
“The legislative history of a statute is the history of its consideration and enactment. ‘Subsequent legislative history’ — which presumably means the post-enactment history of a statute’s consideration and enactment — is a contradiction in terms. The phrase is used to smuggle into judicial consideration legislators’ expression not of what a bill currently under consideration means (which, the theory goes, reflects what their colleagues understood they were voting for), but of what a law previously enacted means. ... In my opinion, the views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed.” Sullivan v. Finkelstein, 496 U. S. 617, 631-632 (1990) (Scalia, J., concurring in part).

 The Court stretches to derive additional support from scattered state-court cases primarily concerned with state constitutional provisions. See ante, at 611-614. To the extent that those state courts assumed that *663 the Second Amendment was coterminous with their differently worded state constitutional arms provisions, their discussions were of course dicta. Moreover, the cases on which the Court relies were decided between 30 and 60 years after the ratification of the Second Amendment, and there is no indication that any of them engaged in a careful textual or historical analysis of the federal constitutional provision. Finally, the interpretation of the Second Amendment advanced in those cases is not as clear as the Court apparently believes. In Aldridge v. Commonwealth, 2 Va. Cas. 447 (Gen. Ct. 1824), for example, a Virginia court pointed to the restriction on free blacks’ “right to bear arms” as evidence that the protections of the State and Federal Constitutions did not extend to free blacks. The Court asserts that “[t]he claim was obviously not that blacks were prevented from carrying guns in the militia. ” Ante, at 611. But it is not obvious at all. For in many States, including Virginia, free blacks during the colonial period were prohibited from carrying guns in the militia, instead being required to “mustefr] without arms”; they were later barred from serving in the militia altogether. See Siegel, The Federal Government’s Power to Enact Color-Conscious Laws: An Originalist Inquiry, 92 Nw. U. L. Rev. 477, 497-498, and n. 120 (1998). But my point is not that the Aldridge court endorsed my view of the Amendment — plainly it did not, as the premise of the relevant passage was that the Second Amendment applied to the States. Rather, my point is simply that the court could have understood the Second Amendment to protect a militia-focused right, and thus that its passing mention of the right to bear arms provides scant support for the Court’s position.

 The Government argued in its brief:
“[I]t would seem that the early English law did not guarantee an unrestricted right to bear arms. Such recognition as existed of a right in the people to keep and bear arms appears to have resulted from oppression by rulers who disarmed their political opponents and who organized large standing armies which were obnoxious and burdensome to the people. This right, however, it is clear, gave sanction only to the arming of the people as a body to defend their rights against tyrannical and unprincipled rulers. It did not permit the keeping of arms for purposes of private defense.” Brief for United States in United States v. Miller, O. T. 1938, No. 696, pp. 11-12 (citations omitted). The Government then cited at length the Tennessee Supreme Court’s opinion in Aymette, 21 Term. 154, *664 which further situated the English Bill of Rights in its historical context. See n. 10, supra.

 Moreover, it was the Crown, not Parliament, that was bound by the English provision; indeed, according to some prominent historians, Article VII is best understood not as announcing any individual right to unregulated firearm ownership (after all, such a reading would fly in the face of the text), but as an assertion of the concept of parliamentary supremacy. See Brief for Jack N. Rakove et al. as Amici Curiae 6-9.

 For example, St. George Tucker, on whom the Court relies heavily, did not consistently adhere to the position that the Amendment was designed to protect the “Blaekstonian” self-defense right, ante, at 606. In a series of unpublished lectures, Tucker suggested that the Amendment should be understood in the context of the compromise over military power represented by the original Constitution and the Second and Tenth Amendments:
“If a State chooses to incur the expense of putting arms into the Hands of its own Citizens for their defense, it would require no small ingenuity to prove that they have no right to do it, or that it could by any means contravene the Authority of the federal Govt. It may be alleged indeed that this might be done for the purpose of resisting the laws of the federal Government, or of shaking off the Union: to which the plainest answer seems to be, that whenever the States think proper to adopt either of these measures, they will not be with-held by the fear of infringing any of the powers of the federal Government. But to contend that such a power would be dangerous for the reasons above-mentioned, would be subversive of every principle of Freedom in our Government; of which the first Congress appears to have been sensible by proposing an Amendment to the Constitution, which has since been ratified and has become part of it, viz., ‘That a well regulated militia being necessary to the Security of a free State, the right of the people to keep & bear arms shall not be infringed.’ To this we may add that this power of arming the militia, is not one of those prohibited to the States by the Constitution, and, consequently, is reserved to them under the twelfth Article of the ratified aments.” 4 S. Tucker, Ten Notebooks of Law Lectures, 1790s, pp. 127-128, in Tucker-Coleman Papers (College of William and Mary).
See also Cornell, St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings, 47 Wm. & Mary L. Rev. 1123 (2006).

 The Court does acknowledge that at least one early commentator described the Second Amendment as creating a right conditioned upon service in a state militia. See ante, at 610 (citing B. Oliver, The Rights of an American Citizen (1832)). Apart from the fact that Oliver is the only commentator in the Court’s exhaustive survey who appears to have inquired into the intent of the drafters of the Amendment, what is striking about the Court’s discussion is its failure to refute Oliver’s description of the meaning of the Amendment or the intent of its drafters; rather, the Court adverts to simple nose counting to dismiss his view.

 Miller, 307 U. S., at 182, n. 3.

 The additional specified weaponry included: “a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle and a quarter of a pound of powder.” 1 Stat. 271.

 In another case the Court endorsed, albeit indirectly, the reading of Miller that has been well settled until today. In Burton v. Sills, 394 U. S. 812 (1969) (per curiam), the Court dismissed for want of a substantial federal question an appeal from a decision of the New Jersey Supreme Court upholding, against a Second Amendment challenge, New Jersey’s gun-control law. Although much of the analysis in the New Jersey court’s opinion turned on the inapplicability of the Second Amendment as a constraint on the States, the court also quite correctly read Miller to hold that “Congress, though admittedly governed by the second amendment, may regulate interstate firearms so long as the regulation does not impair the maintenance of the active, organized militia of the states.” Burton v. Sills, 53 N. J. 86, 99, 248 A. 2d 521, 527 (1968).

 The 1927 Act was enacted with no mention of the Second Amendment as a potential obstacle, although an earlier version of the bill had generated some limited objections on Second Amendment grounds, see 66 Cong. Rec. 725-735 (1924). And the 1934 Act featured just one colloquy, during the course of lengthy Committee debates, on whether the Second Amendment constrained Congress’ ability to legislate in this sphere, see Hearings on H. R. 9066 before the House Committee on Ways and Means, 73d Cong., 2d Sess., 19 (1934).

 The majority appears to suggest that even if the meaning of the Second Amendment has been considered settled by courts and legislatures for over two centuries, that settled meaning is overcome by the “reliance of millions of Americans” “upon the true meaning of the right to keep and bear arms.” Ante, at 624, n. 24. Presumably by this the Court means that many Americans own guns for self-defense, recreation, and other lawful purposes, and object to government interference with their gun ownership. I do not dispute the correctness of this observation. But it is hard to see how Americans have “relied,” in the usual sense of the word, on the existence of a constitutional right that, until 2001, had been rejected by every federal court to take up the question. Rather, gun owners have “relied” on the laws passed by democratically elected legislatures, which have generally adopted only limited gun-control measures.
Indeed, reliance interests surely cut the other way: Even apart from the reliance of judges and legislators who properly believed, until today, that the Second Amendment did not reach possession of firearms for purely private activities, “millions of Americans” have relied on the power of government to protect their safety and well-being, and that of their families. With respect to the case before us, the legislature of the District of Columbia has relied on its ability to act to “reduce the potentiality for gun-related crimes and gun-related deaths from occurring within the District of Columbia,” Firearms Control Regulations Act of 1975 (Council Act No. 1-142), Hearing and Disposition before the House Committee on the District of Columbia, 94th Cong., 2d Sess., on H. Con. Res. 694, Ser. No. 94-24, p. 25 (1976); see post, at 693-696 (Breyer, J., dissenting); so, too, have the residents of the District.

 It was just a few years after the decision in Miller that Justice Frankfurter (by any measure a true judicial conservative) warned of the perils that would attend this Court’s entry into the ‘‘political thicket” of legislative districting. Colegrove v. Green, 328 U. S. 549, 556 (1946) (plurality opinion). The equally controversial political thicket that the Court has decided to enter today is qualitatively different from the one that concerned Justice Frankfurter: While our entry into that thicket was justified because the political process was manifestly unable to solve the problem of unequal districts, no one has suggested that the political process is not working exactly as it should in mediating the debate between the advocates and opponents of gun control. What impact the Court’s unjustified entry into this thicket will have on that ongoing debate — or indeed on the Court itself — is a matter that future historians will no doubt discuss at length. It is, however, clear to me that adherence to a policy of judicial restraint would be far wiser than the bold decision announced today.